JS-6

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHEL HENDRIX,<br><br>            Plaintiff(s),<br><br>    vs.<br><br>NOVARTIS PHARMACEUTICAL CORPORATION,<br><br>            Defendant(s). | Case No.:  CV-13-2402-MWF (PLAx)<br><br>ORDER GRANTING DEFENDANT NOVARTIS PHARMACEUTICALS CORPORATION'S MOTION FOR SUMMARY JUDGMENT [106] |

This matter is before the Court on Defendant Novartis Pharmaceuticals Corporation's ("NPC") Motion for Summary Judgment (the "Motion").  (Docket No. 106).  This case was assigned to this Court on March 19, 2013.

## I.    BACKGROUND

### A. Undisputed Facts

Plaintiff Michel Hendrix was diagnosed with multiple myeloma in September 1999 by his oncologist, Dr. Berenson.  (Plaintiff's Counter-Statement of Uncontroverted Facts ("PCUF") ¶ 1).  As part of his treatment for bone-related

symptoms of his cancer, Dr. Berenson placed Plaintiff in a clinic trial in September 1999, in which Plaintiff received 4mg infusions of the bisphosphonate drug Zometa every three to four weeks. (Defendant's Statement of Uncontroverted Facts ("SUF") ¶ 33; PCUF ¶ 3). His Zometa treatment followed this regimen until it was discontinued in October 2003. (SUF ¶ 72). Zometa was approved by the FDA in February 2002. (SUF ¶ 3).

   In September 2002, Plaintiff's dentist, Dr. Powell, noticed exposed bone in his lower right jaw. (PCUF ¶ 5; SUF ¶ 49). Dr. Powell referred him to an oral surgeon, Dr. Salaita, who recommended and performed a sequestrectomy to remove Plaintiff's exposed dead bone on October 4, 2002. (PCUF ¶¶ 6, 8; SUF ¶ 50). Plaintiff continued to have exposed bone in his lower right jaw, and he consulted an endodontist who performed a root canal on tooth number 31 on November 5, 2002. (PCUF ¶ 9-10; SUF ¶ 51). This procedure was unsuccessful, and Dr. Salaita performed a series of procedures over the next three months designed to relieve Plaintiff's pain and resolve the exposed bone issue, including another sequestrectomy, an incision and drain of an infected area, and extractions of teeth 30 and 31. (PCUF ¶¶ 11-13). During the next seven months, Plaintiff underwent further treatments on his lower right jaw, including an extraction of tooth 32 and another sequestrectomy, but he continued to suffer from exposed necrotic bone. (PCUF ¶¶ 14-16; SUF ¶¶ 53-54). Dr. Salaita's notes dated April 2, 2003, state that Plaintiff's jaw issue was "probably secondary to monthly Prednisone and Zometa (bisphosphonate)." (SUF ¶ 57). He later referred to his reference to Zometa in that note as "something of a guess." (Salaita Dep. at 42).

   Dr. Salaita referred Plaintiff to Dr. Felsenfeld, an oral and maxillofacial surgeon, in or around September 2003. (PCUF ¶ 16). Dr. Felsenfeld met with Plaintiff on September 18, 2003, and the doctor noted his impression that Plaintiff had "bisphosphonate osteonecrosis" (osteonecrosis of the jaw, or "ONJ"). (SUF ¶ 59; PCUF ¶ 17). Plaintiff testified that at his first meeting with Dr. Felsenfeld,

he informed the doctor that he believed his jaw problems resulted from Zometa, although he could not remember the date of that meeting.  (SUF ¶ 61; Plaintiff's Responses to Defendant's Statement of Uncontroverted Facts ("PRSUF") ¶ 61).

On October 14, 2003, Plaintiff saw Dr. Barstis, an oncologist who had been treating him since 1999, to discuss discontinuing Zometa treatment.  (PCUF ¶ 4; SUF ¶ 69).  At that meeting, Plaintiff and Dr. Barstis decided to stop the Zometa treatment.  (SUF ¶ 72).  Dr. Barstis had spoken to Dr. Felsenfeld regarding Dr. Felsenfeld's clinical impressions regarding the connection between Zometa and ONJ.  (SUF ¶ 69).  Around the same time, Dr. Barstis also discussed the connection with Dr. Berenson.  (SUF ¶ 70; PRSUF ¶ 70; Barstis Dep. at 56).  On November 4, 2003, Plaintiff saw an orthopedic doctor, Dr. Bloze, who noted that "it is believed" that Plaintiff's Zometa treatments were discontinued because it caused his ONJ.  (SUF ¶¶ 74-75).

In January 2007, Plaintiff resumed Zometa treatments once per year.  (SUF ¶ 80).  He and Dr. Barstis chose to resume the treatment on a much less frequent basis than he had taken it from 1999 to 2003 because Dr. Barstis believed that once per year treatments were "extremely unlikely" to cause ONJ.  (PCUF ¶¶ 41-42, 45; Barstis Dep. at 68).  His yearly Zometa regimen continues today.  (SUF ¶ 81).

### B. **Procedural History**

Plaintiff filed his Complaint against NPC in the Eastern District of New York on January 13, 2006.  (Docket No. 1).  The case was consolidated in 2007 into multidistrict litigation ("MDL") in the Middle District of Tennessee, along with over a dozen other cases alleging harms suffered from treatment with bisphosphonate drugs Aredia and Zometa.  That multidistrict litigation was styled *In re Aredia & Zometa Products Liability Litigation*, No. 3:06-md-1760 (M.D. Tenn.) ("MDL 1760").  NPC filed its first iteration of the present Motion in the MDL on May 17, 2011 (*Hendrix v. Novartis Pharm. Corp.*, No. 3:06-cv-374 (M.D. Tenn.) ("Case 06-374"), Docket No. 28), but before it could be heard the cases of

1    the MDL were remanded to their respective districts.  (Case 06-374, Docket No.
2    53).  The parties then moved to transfer the instant action from the Eastern District
3    of New York to this Court.  (Docket No. 56).

4          On April 22, 2013, this Court held a preliminary Status Conference to
5    determine the best course to proceed with litigation.  (Docket No. 75).  Pursuant to
6    the Court's order, the parties filed a Joint Status Report ("JSR") on May 6, 2013
7    (Docket No. 83), in which NPC requested leave to supplement the Motion for
8    Summary Judgment it had filed in the MDL with additional briefing to address
9    governing Ninth Circuit law and any factual and legal developments that may have
10   arisen in the two years since the original motion was filed.  (JSR at 7).  The Court
11   issued a Scheduling Order allowing this supplemental briefing (Docket No. 84),
12   and NPC filed the present Motion on August 16, 2013.  (Docket Nos. 106-09).
13   The present Motion includes an argument that Plaintiff's action is barred by the
14   applicable statute of limitations, an argument that was omitted from NPC's original
15   Motion for Summary Judgment.  Plaintiff filed an Ex Parte Application to Strike
16   the Motion, arguing, *inter alia*, that the statute of limitations argument was non-
17   supplemental, and thus the Motion fell beyond the scope of the Court's Scheduling
18   Order.  (Docket Nos. 117-18).  The Court denied Plaintiff's application.  (Docket
19   No. 124).

20

21   II.   **DISCUSSION**
22         A.   **Legal Standard**
23         Under the Federal Rules of Civil Procedure, a movant is entitled to summary
24   judgment if it can demonstrate that there is no genuine dispute as to any material
25   fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P.
26   56(a).  In deciding a motion for summary judgment under Rule 56, the Court
27   applies *Anderson*, *Celotex*, and their Ninth Circuit progeny.  *Anderson v. Liberty*
28   *Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986); *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 323-24, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). Where, as here, "the non-moving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case." *In re Oracle Corp. Securities Litig.*, 627 F.3d 376, 387 (9th Cir. 2010). The burden then shifts to the non-moving party, which may not simply rely on allegations in its pleadings but must identify specific facts raising a genuine dispute that will be material at trial. Fed. R. Civ. P. 56(c).

NPC advances two bases for summary judgment that it claims dispose of Plaintiff's action in full. First, the action is barred by the statute of limitations, and second, Plaintiff cannot show that any alleged wrongdoing by NPC proximately caused his injuries. (Mot. at 11-16). Additionally, NPC argues that Plaintiff's first claim for relief fails as a matter of law because California does not recognize claims of defective design of prescriptions drugs. (Mot. at 17). Finally, NPC argues that the fourth and fifth claims for relief for breaches of express and implied warranties are not cognizable in personal injury actions under California law because such theories of recovery have been subsumed into the theory of strict products liability, and because Plaintiff has failed to allege the exact terms of any express warranty made to him by NPC. (Mot. at 17-18).

Because this Court determines that there is no genuine issue of material fact as to whether this action was brought within the period prescribed by the applicable statute of limitations, and NPC is entitled to judgment as a matter of law on that basis alone, it does not reach NPC's remaining three arguments.

## B.   Statute of Limitations

A federal court sitting in diversity jurisdiction must generally apply the law of the forum state regarding whether an action is barred by the statute of limitations. *Guaranty Trust Co. v. York*, 326 U.S. 99, 109-10, 65 S. Ct. 1464, 89 L. Ed. 2079 (1945). Under California law, personal injury actions are subject to a two year limitation. Cal. Code Civ. Proc. § 335.1. Generally, a cause of action

accrues and the limitations clock "begins to run upon the occurrence of the last element essential to the cause of action." *Neel v. Magana, Olney, Levy, Cathcart & Gelfand*, 6 Cal.3d 176, 187, 98 Cal. Rptr. 837 (1971).

The discovery rule, however, is an exception to this general rule whereby a cause of action does not accrue until the plaintiff discovers, or has reason to discover, that he has been wrongfully injured. *See, e.g.*, *Jolly v. Eli Lilly & Co*, 44 Cal.3d 1103, 1110-11, 245 Cal. Rptr. 658 (1988). Plaintiff filed this lawsuit on January 17, 2006. The parties agree that the alleged injury occurred no later than 2002; thus, his action is barred by the statute of limitations unless he carries his burden of showing that he had no actual or inquiry notice of the nature of his cause of action prior to January 17, 2004.

## 1. The Statute of Limitations Defense Was Not Waived

As a preliminary matter, Plaintiff argues that NPC waived its statute of limitations defense by failing to raise the defense in its original motion for summary judgment. The Court disagrees.

Under the Federal Rules of Civil Procedure, an affirmative defense properly pleaded in the answer is not waived despite the defendant's failure to raise the defense in a later motion. *See Alcantar v. Hobart Serv.*, No. EDCV-11-1600-PSG (SPx), 2013 WL 228501, at *5 (C.D. Cal. Jan. 22, 2013) (holding that a defendant who had properly pleaded an exhaustion of remedies defense did not waive the defense by waiting until the Final Pretrial Conference Order to litigate it); *see also Greenberg v. U.S. Dep't of Treasury*, 10 F. Supp. 2d 3, 23 (D.D.C. 1998) ("The Court is aware of no authority which requires a party to raise an affirmative defense pled in its answer in its first motion for summary judgment in order to avoid waiving that defense.").

Plaintiff cites *Shewbridge v. El Dorado Irrigation District*, No. CIV-S-05-0740-FCD-EFB, 2007 WL 1294392 (E.D. Cal. Apr. 30, 2007), in support of his argument that statute of limitation defense has been waived. The *Shewbridge* court

denied the defendants' motion to modify the pretrial scheduling order to permit the filing of a dispositive motion on an affirmative defense that the defendants had asserted in their answer but raised for the first time in the joint pretrial conference statement.  The posture of that decision was critically different from the present motion.  The *Shewbridge* defendant had missed a deadline for filing dispositive motions set forth in the pretrial scheduling order; as such, Rule 16(b) required the defendant to show "good cause" to modify the order.  *Id.* at *2.  That rule is not applicable here.

Nevertheless, the *Shewbridge* court did suggest that a district court may deem an affirmative defense waived when a defendant unduly delays in litigating the defense in a way that unfairly prejudices the plaintiff.  *Id.* at *3 (citing *North Pacifica, LLC v. City of Pacifica*, 366 F. Supp. 2d 927, 930 (N.D. Cal. 2005) (holding that a defendant that had asserted an unclear and "conclusory" preclusion defense in its answer had waived the defense by waiting until the end of the liability phase of the trial to raise the issue); *Kern Oil & Refining Co. v. Tennoco Oil Co.*, 840 F.2d 730, 740-41 (9th Cir. 1988) (holding that a defendant who had failed to raise a res judicata defense in its answer had waived it under Rule 8, and could not amend its answer to include the defense after the end of the trial).  The Court is aware of no authority, however, suggesting that it has the power to deem a properly pleaded defense waived ***before trial***, and indeed even before a Rule 16 pretrial conference.

Even if such a power exists, the Court determines that NPC did not unduly delay in raising this defense, and Plaintiff has suffered no unfair prejudice.  Plaintiff had notice that NPC intended to raise a statute of limitations defense.  Plaintiff argues that the specific arguments raised in this Motion caught him by surprise, and he would have liked to conduct further discovery to refute them, but throughout the discovery period in this case NPC has made no attempt to hide that it wanted to determine whether the action was barred.  NPC has asked questions in

several depositions directly related to the precise time at which Plaintiff suspected or should have suspected a causal relationship between Zometa and ONJ. Plaintiff now claims he was unable to conduct fact discovery on that same issue, but this claim is baseless. He was on notice of the statute of limitations defense since NPC filed its answer, and has been reminded during the discovery process. While it is curious that NPC chose not to address the statute of limitations in its original Motion for Summary Judgment, Plaintiff cannot show that any delay was unreasonable or prejudicial.

The Court thus rules that NPC did not waive its statute of limitations defense.

### 2. If Tolling Is Unavailable, Then Plaintiff's Suit Is Untimely

NPC argues that Plaintiff's suit is barred by the statute of limitations because prior to January 17, 2004, Plaintiff knew, or a reasonable investigation would have uncovered, a factual basis for his claim that he was inadequately warned about the dangers of Zometa. Under California's discovery rule, a cause of action does not accrue, for purposes of the statute of limitations, until the plaintiff discovers, or has reason to discover, that he has been wrongfully injured. *See Jolly*, 44 Cal.3d at 1110-11. "[T]he plaintiff discovers the cause of action when he at least suspects a factual basis, as opposed to a legal theory, for its elements, even if he lacks knowledge thereof—when, simply put, he at least 'suspects . . . that someone has done something wrong' to him, 'wrong' being used, not in any technical sense, but rather in accordance with its 'lay understanding.'" *Norgart v. Upjohn Co.*, 21 Cal.4th 383, 397-98, 87 Cal. Rptr. 2d 453 (1999) (citations omitted) (quoting *Jolly*, 44 Cal.3d at 1110 & n.7). He has reason to discover the injury when he has "notice or information of circumstances to put a reasonable person on *inquiry*." *Jolly*, 44 Cal.3d at 1110-11 (quoting *Gutierrez v. Mofid*, 39 Cal.3d 892, 896-97, 218 Cal. Rptr. 313 (1985)). In order for the discovery rule to delay the accrual of a cause of action, the plaintiff bears the burden of showing that he "conduct[ed] a

reasonable investigation of all potential causes of [his] injury," and failed to discover that the injury was wrongfully caused "despite reasonable diligence." *Fox v. Ethicon Endo-Surgery, Inc.*, 35 Cal.4th 797, 808, 27 Cal. Rptr. 3d 661 (2005) (quoting *McKelvey v. Boeing N. American, Inc.*, 74 Cal. App. 4th 151, 160, 86 Cal. Rptr. 2d 645 (1999)) (internal quotation marks omitted).

The discovery rule does not trigger accrual of a cause of action unless the plaintiff has some reason to suspect *wrongdoing*; that is, when a plaintiff, through reasonably diligent investigation, discovers only that he has been injured but not that the injury may have a wrongful cause, then the clock has not yet begun to run. *See Nev. Power Co. v. Monsanto Co.*, 955 F.2d 1304, 1307 (9th Cir. 1992) (holding that the facts supported a reasonable inference that the plaintiff could have believed it was injured as a result of "innocent mistakes" rather than fraud, and this inference rendered summary judgment inappropriate).

Here, the gravamen of Plaintiff's complaint is that NPC wrongfully failed to warn him of a possible connection between Zometa and ONJ. Under the discovery rule, therefore, the statute of limitations clock began to run as soon as Plaintiff had good cause to suspect that Zometa may have caused his ONJ.

Under California law, a plaintiff seeking the benefit of the discovery rule "must specifically plead facts to show (1) the time and manner of discovery and (2) the inability to have made earlier discovery despite reasonable diligence. The burden is on the plaintiff to show diligence . . . ." *McKelvey*, 74 Cal. App. 4th at 160. There is no plausible interpretation of the undisputed facts that allows Plaintiff to meet his burden. The Opposition argues only that NPC incorrectly pegs the date of discovery at September 18, 2003 (Opp. at 12) but does not marshal evidence in favor of an alternative date. Ultimately, the Court determines that the evidence presented requires the conclusion that Plaintiff had reason to suspect by the end of 2003 that he had suffered an adverse reaction from taking Zometa, and a reasonable investigation, including ordinary conversations with his physicians,

would have revealed a factual basis for his present claims.  For this reason, NPC is entitled to summary judgment on all claims.

NPC advances two specific facts supporting its claim that Plaintiff had actual knowledge by Fall 2003 that he had suffered an adverse reaction to Zometa. ***First***, Plaintiff stated in his deposition that he had told Dr. Felsenfeld about his broken jawbone, and that he believed the cause was Zometa.  (SUF ¶ 61; Hendrix Dep. 1/12/2011 at 233, 235).  ***Second***, Plaintiff and Dr. Felsenfeld did in fact discuss Plaintiff's ONJ, and Dr. Felsenfeld said that he also suspected that Zometa caused ONJ, and that the doctor had seen two or three other bisphosphonate patients with the same condition.  (SUF ¶ 62; Hendrix Dep. at 233).  Plaintiff stated that he cannot remember the date that he had this conversation with Dr. Felsenfeld, but Dr. Felsenfeld's notes indicate that this meeting happened on September 18, 2003.  (SUF ¶ 59; Berger Dec. Ex. 61).

Plaintiff contends he only remembered an approximate date that he saw a television commercial describing a possible link between Zometa and ONJ, and a genuine issue of fact remains as to the date when he developed his suspicion. (Opp. at 10; PRSUF ¶ 61).  Indeed, the facts surrounding this advertisement are somewhat vague; NPC claims in its Reply that it has never advertised Zometa on television.  (Reply at 3).  But even if the exact date Plaintiff learned of (or at least began to suspect) a causal connection between ONJ and Zometa is unclear, Plaintiff has not provided a sufficient basis to dispute that he and Dr. Felsenfeld discussed their mutual suspicion on September 18, 2003.  Any reasonable jury would inevitably conclude that Plaintiff must have discovered his injury by September 18, 2003, which triggered the statute of limitations.

Additionally, NPC argues that Plaintiff had sufficient information to be put on inquiry notice of his injury as early as April 2, 2003 (Mot. at 13 (citing SUF ¶ 57)).  In addition to Dr. Felsenfeld, four more of Plaintiff's treating physicians

indicated in Plaintiff's health records, with varying degrees of certainty, that the ONJ was linked to Zometa.

Dr. Salaita, making, in his words, "something of a guess," opined in April 2003 that Plaintiff's jaw problem was "probably secondary to prednisone and monthly Zometa bisphosphonates." (PCUF ¶ 22; Salaita Dep. at 40-41). Although he "was looking more at the prednisone," he thought that "as a chemotherapeutic agent [Zometa] may have been inhibiting healing of the soft tissue." (Salaita Dep. at 41-42).

Drs. Barstis and Berenson discussed the connection between Zometa and ONJ with Dr. Felsenfeld in or around October 2003. (SUF ¶ 70; Barstis Dep. at 54-56). Plaintiff disputes the timing of these conversations, and to what extent Drs. Barstis and Berenson made independent diagnoses, but Dr. Barstis's undisputed testimony described a period in October 2003 in which Drs. Felsenfeld, Barstis, and Berenson, discussed whether the benefits of Zometa outweighed "the possible damage." (Barstis Dep. at 56 ("A: And Dr. Felsenfeld told me that in his opinion if the Zometa was helping the patient, that he thought it might outweigh the—the possible damage and that he thought that one should consider continuing with the Zometa and I believed—I didn't think I should. And I think Dr. Berenson didn't either, but I don't—I just don't remember that discussion. But I did talk to him.")). Neither Dr. Barstis nor Dr. Berenson diagnosed Plaintiff with ONJ, as Plaintiff points out (Opp. at 20-21; PCUF ¶ 20-21), but both considered the possibility that Plaintiff was experiencing jaw problems as a side effect of Zometa.

Finally, Dr. Bloze wrote in her November 4, 2003 office notes that Plaintiff "was treated for osteoporosis with Zomata [sic], which was recently discontinued. Apparently, it is believed that this has caused osteonecrosis of his right jaw." (SUF ¶ 75; Berger Dec. Ex. 69).

Plaintiff insists that these doctors merely suspected that Zometa caused ONJ. (Opp. at 19-20). Dr. Salaita only guessed that Zometa may have played a role in

1  Plaintiff's ONJ.  Drs. Berenson and Barstis testified to ignorance as to the
2  connection between Zometa and ONJ.  (Opp. at 20-23).  Plaintiff does not address
3  Dr. Bloze's records, but she appeared to rely on other doctors' diagnoses.  (SUF ¶
4  75).  And Dr. Felsenfeld made only a "working diagnosis."  (Opp. at 23-24).

5          Plaintiff is undoubtedly correct that none of his treating physicians had, in
6  2003, conclusively determined that Plaintiff's ONJ was caused by Zometa.
7  Caution and prudence are marks of a good doctor.  But the lack of certainty is
8  irrelevant.  California law does not require a plaintiff to be certain of the cause of
9  his injury before his cause of action accrues; it merely requires facts sufficient to
10  put a reasonable plaintiff in suspicion that he has been wronged.  *See Fox*, 35
11  Cal.4th at 807; *Norgart*, 21 Cal.4th at 398.  It requires the plaintiff, once put in
12  suspicion, to conduct a reasonable investigation, *see Fox*, 35 Cal.4th at 808, which
13  surely includes ordinary discussions with one's treating physicians as to possible
14  causes of one's injuries.

15          Even if Plaintiff is correct in asserting that those of his doctors who were
16  uncertain as to the link between Zometa and ONJ would have scrupulously
17  maintained that they did not know what caused Plaintiff's injuries (*see* Opp. at 23),
18  notwithstanding the suspicions they noted in his health records, the "working
19  diagnosis" that Dr. Felsenfeld shared with Plaintiff, coupled with Plaintiff's jaw
20  injury and his own suspicions, sufficed to put Plaintiff on notice of his claim and
21  trigger the statute of limitations.  Even one "probable" diagnosis has been held to
22  put a plaintiff on inquiry notice of his claim.  *See Gray v. Reeves*, 76 Cal. App. 3d
23  567, 577, 142 Cal. Rptr. 716 (1978) (holding that a diagnosis that plaintiff's injury
24  was "probably caused" by a drug was "enough to put [him] on notice"); *Holmes v.*
25  *Hospira, Inc.*, No. EDCV-12-01708 VAP (DTBx), 2013 WL 1516952, at *5 (C.D.
26  Cal. Apr. 11, 2013) (holding that the "possible diagnosis" of a single doctor linking
27  plaintiff's injuries to an adverse drug reaction, among several doctors providing
28  various other possibilities, sufficed to trigger the statute of limitations).

Plaintiff's other arguments to the contrary are unavailing.  Plaintiff asserts that a reasonable investigation could not have uncovered a causal connection between Zometa and ONJ in 2003 because at that time, NPC denied such a connection (Opp. at 13-14; PCUF ¶ 29); because its expert witness has denied and continues to deny such a connection (Opp. at 16; PCUF ¶ 33-34); and even its updated Zometa package insert, released to doctors and consumers in or around December 2003, remained equivocal as to the possibility that Zometa causes ONJ (Opp. at 15; PCUF ¶¶ 31-32).  But the discovery rule does not delay the accrual of a cause of action until the defendant admits to the alleged wrongdoing.  It may be true that if Plaintiff had confined his investigation to asking NPC and its agents whether Zometa had caused his injury, NPC would not have told him that Zometa causes ONJ.  California law, however, requires more: plaintiffs must conduct a reasonable investigation.  By the end of 2003, Plaintiff had developed a jaw injury that he and his treating physicians believed may be causally linked to Zometa.  A reasonable investigation would have revealed his doctors' suspicions and the factual basis of Plaintiff's failure to warn and related claims.

Accordingly, this action is untimely unless the statute of limitations was tolled pursuant to some doctrine recognized under California law.  The Court now turns to that crucial issue.

### 3.  The Statute of Limitations Was Not Tolled by *Becker v. Novartis Pharmaceutical Corp.*

On September 15, 2005, Susan Becker filed a complaint against NPC in the Middle District of Tennessee, alleging personal injuries resulting from Zometa use on behalf of herself and a class of persons that included Plaintiff.  *Becker v. Novartis Pharm. Corp.*, No. 3:05-cv-0719 (M.D. Tenn. Sept. 15, 2005) (the "Tennessee Class Action").  *Becker* was consolidated into the MDL-1760 on April 19, 2006.

Plaintiff claims that the rule of *American Pipe & Construction Co. v. Utah*, 414 U.S. 538, 94 S. Ct. 756, 38 L. Ed. 2d 713 (1974), should apply to toll the statute of limitations on his claim during the pendency of a class action suit in which he was a member of the putative class.  Alternatively, Plaintiff claims that even if the *American Pipe* rule does not directly apply, his lawsuit is nonetheless timely under California's equitable tolling doctrine, because Plaintiff is a resident of California who acted in good faith and NPC is not prejudiced by having to defend against this separate action.  *See Hatfield v. Halifax PLC*, 564 F.3d 1177, 1188 (9th Cir. 2009) (citing *Becker v. McMillin Constr. Co.*, 226 Cal. App. 3d, 277 Cal. Rptr. 491 (1991)).  The September date is critical, because much of the evidence proffered by NPC in support of its Motion suggests that Plaintiff and his treating physicians may have begun to suspect that the Zometa treatments were linked to his ONJ around September of 2003.

Although the interplay between *American Pipe* tolling and equitable tolling remains the subject of some confusion, as discussed below, this Court holds that neither *American Pipe* tolling nor equitable tolling benefit Plaintiff.

### a. *American Pipe* Tolling

The Supreme Court ruled in *American Pipe* that under the Federal Rules of Civil Procedure, the "commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action," even when class certification is ultimately denied.  414 U.S. at 544.  As a federal court sitting in diversity jurisdiction, however, this Court is bound by state law with respect to the tolling of statutes of limitations and the treatment of class action lawsuits.  *York*, 326 U.S. at 110 (holding that when state law would bar recovery under its statute of limitations, it "bears on a State-created right vitally," and thus a federal court must follow state law).  The parties agree that California law governs this dispute.

14

The California Supreme Court first ruled on the applicability of the *American Pipe* tolling rule under California law in *Jolly*, 44 Cal.3d at 1118-26. In *Jolly*, the plaintiff sued a drug manufacturer, claiming that she had been injured *in utero* by her mother's use of the allegedly defective drug diethylstilbestrol (DES). *Id.* at 1107. She claimed that, although her action was brought outside the time required under the applicable statute of limitations, the rule of *American Pipe* tolled the statute of limitations during the pendency of a class action in which she was a member of the putative class. *Id.* at 1117.

The *Jolly* court weighed the policy considerations underlying the tolling rule, namely protecting of the efficiency and economy of class action litigation (by eliminating the incentive for class members to file individual actions to preserve their claims) while ensuring that defendants are protected from unfairly delayed claims. *Id.* at 1121. In *American Pipe*, the court reasoned, the defendants had been fairly put on notice of the general nature of the claims within the putative class by the filing of the class action. The class action suit at issue in *Jolly*, by contrast, had not put defendants on notice of the scope of the claims within the class, because the suit had only sought damages on behalf of the representative and not the class as a whole, and because personal injury claims tend to vary widely in the underlying facts related to major elements of each claimant's claim. *Id.* at 1123-24. Furthermore, denying the tolling was not unfair to class members, who would not reasonably be expected to delay filing individual claims during the pendency of a class action that sought no damages on their behalf.

The California Supreme Court ultimately declined to apply the *American Pipe* rule to a personal-injury mass-tort class action case arising from alleged product defects and negligence relating to a prescription drug. In so doing, it declined to address "the broader question whether in *any* personal injury mass-tort case the filing of a class action complaint can serve to toll the statute of limitations for putative class members when the class ultimately is denied certification for lack

of commonality." *Id.* at 1125 (emphasis added).  It did, however, reason that the lack of commonality that typifies personal-injury mass-tort class action cases *presumptively* precludes application of the *American Pipe* tolling rule because the class action suit rarely will serve to sufficiently notify the defendants of each class member's claim.  *Id.*

In *Clemens v. DaimlerChrysler Corp.*, 534 F.3d 1017, 1025 (9th Cir. 2008), a California plaintiff sought the benefit of *American Pipe* tolling to preserve his claim during the pendency of a class action lawsuit filed in Illinois in which the plaintiff was a member of the putative class.  The Ninth Circuit noted that California, like most states, had not adopted "cross-jurisdictional" tolling.  *Id.*  It concluded that in the absence of California authority permitting cross-jurisdictional tolling, it would refrain from "importing" the doctrine into California law.  *Id.*  The Ninth Circuit cited to *Wade v. Danek Med., Inc.*, 182 F.3d 281, 287-88 (4th Cir. 1999), in which the Fourth Circuit declined to import cross-jurisdictional tolling into Virginia law in part because of the "unwieldy prospect of tying Virginia's statute of limitations to the resolution of claims in other jurisdictions."  534 F.3d at 1025.

Plaintiff here seeks to toll the statute of limitations based on the Tennessee Class Action.  Therefore, the Ninth Circuit's interpretation of California law on cross-jurisdictional tolling applies, and *Clemens* bars the application of *American Pipe* tolling in this case.  Any tolling of the statute of limitations must fall within California's doctrine of equitable tolling.

### b. Equitable Tolling

The applicability of equitable tolling remains somewhat ill-defined in cases in which a plaintiff seeks to toll an individual action during the pendency of a class action in which he or she was merely a member of the putative class.  Prior to *Clemens*, California courts deciding such cases appeared to apply solely the test laid out in *Jolly*, without reference to California's equitable tolling doctrine.  The

courts simply scrutinized the complaint in the prior class action to determine whether it was of a type that would reasonably put the defendant on notice of the individual claims of the putative class members.  *See, e.g.*, *S.F. Unified Sch. Dist. v. W.R. Grace & Co.*, 37 Cal. App. 4th 1318, 44 Cal. Rptr. 2d 305 (1995) (granting tolling under *Jolly*, then rejecting defendant's arguments that principles of equity should defeat tolling); *Becker*, 226 Cal. App. 3d 1493 (applying *Jolly* without reference to equitable tolling, and determining that a geographically limited, property-based class action suit properly put defendants on notice of individual plaintiffs' claims).

One year after *Clemens*, the Ninth Circuit decided *Hatfield v. Halifax PLC*, 564 F.3d 1177 (9th Cir. 2009).  It maintained that "the California Supreme Court has indicated a general agreement with tolling in the class action context."  *Id.* at 1187-88 (citing *Jolly*, 44 Cal.3d at 1120-21).  At issue was the alleged wrongful withholding from investors of the proceeds from the sale of a building society.  Judith Hatfield, the plaintiff in *Halifax*, filed a class action suit in a New Jersey trial court, and following dismissal of the suit she filed a substantively identical class action suit in federal court in California.  *Id.* at 1179-80.  The district court granted a motion to dismiss on the ground that the suit was barred by the statute of limitations.

In considering whether Hatfield's own individual claim was tolled by the New Jersey class action, the Ninth Circuit applied the black-letter three-factor test for equitable tolling under California law: "(1) timely notice to the defendant in the filing of the first claim; (2) lack of prejudice to the defendant in gathering evidence to defend against the second claim; and (3) good faith and reasonable conduct by the plaintiff in filing the second claim."  *Halifax*, 564 F.3d at 1185 (citing *Collier v. City of Pasadena*, 142 Cal. App. 3d 917, 191 Cal. Rptr. 681 (1983)).  The Ninth Circuit held that the traditional equitable tolling doctrine applied because the defendants had been given timely notice, no prejudice had been shown because the

two claims were substantially similar, and the second action was filed on the same day the New Jersey Appellate Division upheld dismissal of the first action.  *Id.*

Considering whether the claims of putative class members were tolled, the Ninth Circuit drew a distinction between California resident class members, whose claims California had an interest in protecting, and non-resident class members. As to residents, the Ninth Circuit reasoned, California's doctrine of equitable tolling applies *alongside* the rule of *American Pipe* as interpreted by the California Supreme Court in *Jolly*.  Consequently, although *Clemens* would have barred application of *American Pipe* to the class members because the first suit was filed in a different jurisdiction, equitable tolling potentially rescued their claims.

The Ninth Circuit cited *Becker* in support of this conclusion, although the *Becker* court relied exclusively on *Jolly* and *American Pipe* and did not purport to apply equitable tolling as a doctrine distinct from *American Pipe* tolling.  (The *Halifax* court noted that some California cases treat the doctrines as interchangeable.  564 F.3d at 1188.)  In *Becker*, the plaintiffs in a class action suit alleging improper construction of houses in a subdivision lost their motion for class certification on the basis that the claims lacked commonality.  *Id.* at 493.  The *Becker* court noted *Jolly*'s admonition that class action suits that lack the commonality required for class certification rarely suffice to put the defendants on notice of each class member's individual claims, and thus tolling will generally be unavailable.  *Id.* at 495 (citing *Jolly*, 44 Cal.3d at 1125).  Nevertheless, the court distinguished *Jolly* because the claims at issue in *Becker* had substantial similarities.  Each claim was based on alleged negligent construction of similar houses in a geographically confined area.  The defendant was put on notice of the possibility that each homeowner in the subdivision—and no other plaintiffs—may have claims against it.  This limited scope contrasted starkly with the nebulous, nationwide class in *Jolly*.  *Id.* at 497.

The *Halifax* court concluded that "*Jolly* and *Becker* would clearly permit equitable tolling at least as to any class members who individually subsequently filed a similar claim. . . . Thus, every indication is that California would at least apply equitable tolling to claims made by its own residents." *Halifax*, 564 F.3d at 1189. This conclusion seems difficult to square with *Clemens*, which, also relying on *Jolly*, concluded that tolling could *not* apply under California law if the prior class action was filed in a different jurisdiction. The *Halifax* court distinguished *Clemens* by noting that equitable tolling extends beyond *American Pipe* tolling. *See id.* at 1188 ("Although the two types of tolling—equitable and *American Pipe*—overlap to some extent, *see Becker*, 277 Cal. Rptr. at 496, and even though California courts have treated them at times as interchangeable, they are not congruent.").

Several cases involving class action tolling under California law have interpreted *Halifax* to require applying both the *Jolly* test (as an application of *American* Pipe) and then the traditional, three-part equitable tolling test. *See Delagarza v. Tesoro Refining and Mktg. Co.*, No. C-09-5803 EMC, 2011 WL 4017967 (N.D. Cal. Sept. 8, 2011) (holding that tolling was unavailable under *American Pipe* because the latter suit simply attempted to relitigate denial of class certification, but tolling was allowable under *Halifax* because "Defendant makes only a cursory claim of prejudice," *id.* at *5); *Centaur Classic Convertible Arbitrage Fund Ltd. v. Countrywide Fin. Corp.*, 878 F. Supp. 2d 1009 (C.D. Cal. 2011) (applying *Clemens* bar on cross-jurisdictional application of *American Pipe*, and then holding that equitable tolling was unavailable because plaintiff's two actions were filed subsequently in the same court); *see also Vincent v. Money Store*, 915 F. Supp. 2d 553 (S.D.N.Y. 2013) (applying California law); *Gardner v. Shell Oil Co.*, No. 09-05876-CW, 2010 WL 1576457 (N.D. Cal. Apr. 19, 2010); *Moore v. Wachovia Securities*, No. CV-09-9071-AHM (VBKx), 2010 WL 1437923 (C.D. Cal. Mar. 15, 2010); *Love v. First Mortg. Corp.*, No. G044630,

2012 WL 314875 (Cal. Ct. App. 2012) (unpublished opinion, may not be cited in California courts).  On the other hand, one district court described *Halifax* as "embrac[ing] th[e] rule" of *American Pipe*; that court did not apply the three-part equitable tolling test.  *Baker v. Aegis Wholesale Corp.*, No. C 09-5280-PJH, 2010 WL 2853915 (N.D. Cal. 2010).

This Court will presume that it must apply the three-part equitable tolling test and that *Halifax* allows Plaintiff to argue that equitable tolling should occur despite *Clemens* and *Jolly.*  Although theoretically equitable tolling is available, this Court cannot conclude that the California Supreme Court would apply the doctrine to these facts.  This conclusion, on which the grant of summary judgment turns, is based on two reasons:

*First,* the facts of this case are simply too close to the facts of *Jolly* and too different from the facts of *Becker.*  The California courts do not view *American Pipe* and equitable tolling as being vastly disparate doctrines.  Yes, *Halifax* shows that a case can exist in which one doctrine applies and the other does not.  However, the facts in *Halifax* were quite different from *Jolly.*  If California recognized cross-jurisdictional tolling, then under *Jolly* the California Supreme Court would have applied *American Pipe* to the facts in *Halifax.*  Likewise, *Halifax* relied on the reference to "equities" by the Court of Appeal in *Becker.*

Given the similarity between the two doctrines, the Court does not believe that the California Supreme Court would view Plaintiff—indistinguishable as he is from the plaintiff in *Jolly*—as deserving equitable tolling.  Under *Jolly*, the filing of a class action suit may toll the individual claims of putative class members so long as the defendant received fair notice of the claims of individual class members by the filing of the initial class action, which protects the defendant from unfair and duplicative claims.  *Jolly*, 44 Cal.3d at 1122-23.  "[B]ecause personal-injury mass-tort class-action claims can rarely meet the community of interest requirement in that each member's right to recover depends on facts peculiar to

each particular case, such claims may be presumptively incapable of apprising defendants of 'the substantive claims being brought against them' . . . ." *Id.* at 1125 (quoting *Am. Pipe*, 414 U.S. at 555).

*Jolly*'s rationale in denying tolling because of possible prejudice to defendants is fully applicable here.  The present case, like *Jolly*, involves a plaintiff seeking the benefit of tolling of his own cause of action based on a mass-tort personal-injury class action suit alleging injuries caused by a prescription drug.  This fact easily distinguishes the present case from *Halifax*, which involved a suit based on property damage.  Such suits tend to have narrower factual bases, and equitable tolling is more likely to apply.  *See Halifax*, 564 F.3d at 1180 (damages sought by investors for withholding of sale proceeds); *Becker*, 226 Cal. App. 3d at 1496 (damages sought for defective and negligently constructed real property).  The Tennessee Class Action alleged that Zometa caused osteonecrosis of the jaw among some minority of those individuals who had taken the drug.  The possible claimants, therefore, could have been any individual who had taken Zometa at any time.  Each had taken different dosages, worked with different prescribing physicians, and had a unique medical history.  The Tennessee Class Action could not have alerted NPC to the possibility of any individual class member's claims.

Putting the cross-jurisdictional issue aside, only in an extremely rare case will *American Pipe* tolling be unavailable but the three-part-test equitable tolling be available.  This action is not that extremely rare case.  The analysis in *Jolly* is important in regard to equitable tolling as well as *American Pipe* tolling.

**Second,** application of the three-part test to the individual claims of Plaintiff Michel Hendrix does not result in tolling.  The *Halifax* panel did not itself apply the three-part equitable tolling test to the claims of class members, but only to the individual claims of Judith Hatfield, the named plaintiff in both the earlier New Jersey case and the later California case.  According to a long line of California precedents, including those cited in *Halifax*, a plaintiff who wishes to benefit from

equitable tolling must have actually relied on the use of some other legal mechanism to vindicate his rights.  *See Addison v. State*, 21 Cal.3d 313, 317, 146 Cal. Rptr. 224, 578 P.2d 941 (1978) ("[C]ourts have adhered to a general policy which favors relieving plaintiff[s] from the bar of a limitations statute when, ***possessing several legal remedies*[,] *he* . . . *pursues one*** designed to lessen the extent of his injuries or damage.'" (citing California Supreme Court cases) (emphasis added)); *see also McDonald v. Antelope Valley Cmty. Coll. Dist.*, 45 Cal.4th 88, 100, 84 Cal. Rptr. 3d 734 (2008) ("[California's equitable tolling] may apply where one action stands to lessen the harm that is the subject of a potential second action; where administrative remedies must be exhausted before a second action can proceed; or where a first action, embarked upon in good faith, is found to be defective for some reason."), *cited in Halifax*, 564 F.3d at 1188.

Plaintiff did not delay filing this action ***because of*** the pendency of the Tennessee Class Action.  Indeed, he filed his suit a mere four months after the Tennessee Class Action was filed, and the two suits proceeded concurrently for several years.  Given this history, it is not plausible that Plaintiff relied on an out-of-state class action suit as part of the diligent pursuit of his rights, and thus equitable tolling does not apply.

Lurking in the above analysis is the issue whether the availability of equitable tolling is an issue for the district court or for the jury.  That issue need not be resolved here because there simply are no disputed facts in regard to the equities for a jury to resolve.

Accordingly, the Court **GRANTS** Defendant's Motion for Summary Judgment as to all counts.  Because the Court holds that Plaintiff's suit is time barred, it declines to reach NPC's remaining arguments.

This Order shall constitute notice of entry of judgment pursuant to Federal Rule of Civil Procedure 58.  Pursuant to Local Rule 58-6, the Court ORDERS the Clerk to treat this Order, and its entry on the docket, as an entry of judgment.

IT IS SO ORDERED.

Dated:  October 2, 2013

_____
MICHAEL W. FITZGERALD
United States District Judge